# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT BARLETT and PATRICK LEYDEN, individually and on behalf of other similarly situated SWAT team members of the Chicago Police Department, ) ) ) ) ) | | |
| Plaintiffs, ) | | |
| ) | | |
| v. ) | 14 C 7225 | |
| ) | | |
| CITY OF CHICAGO, ) | | |
| ) | | |
| Defendant. ) | | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court are Plaintiffs Robert Bartlett ("Bartlett") and Patrick Leyden's ("Leyden"), individually and on behalf of other similarly situated members of the Chicago Police Department (the "CPD") (collectively, "Plaintiffs") and Defendant City of Chicago's (the "City") cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the City's motion and denies the Plaintiffs' motion.

## BACKGROUND

The following facts are taken from the record and are undisputed unless otherwise noted.

*The Parties*

Plaintiffs Bartlett and Leyden are CPD officers who were both assigned to the CPD's Special Weapons and Tactics ("SWAT") Unit when it became a full-time unit in 2005. Bartlett was assigned to the SWAT Unit until April 2017. He is currently on leave from the CPD while performing duties as a field representative for The Fraternal Order of Police, Chicago Lodge No. 7 ("FOP"), the union that represents CPD officers below the rank of sergeant. Leyden remains assigned to the SWAT Unit.

In addition to Bartlett and Leyden, Plaintiffs' FLSA certified collective class includes 76 opt-in plaintiffs, and the Rule 23 certified class consists of 102 class members. The Plaintiffs currently work or formerly worked as operational members of the SWAT Unit in the rank of police officer.

*SWAT Background*

The mission of the SWAT Unit is to provide a tactical response to critical incidents where the potential for injury and/or loss of life is present and where the circumstances are unusual and beyond the capabilities of normal police response. Critical incidents include, but are not limited to, hostage situations, barricaded and/or suicidal subjects, sniper situations, high-risk apprehension of individuals, active shooter incidents, and incidents relating to terrorism and/or weapons of mass destruction. The SWAT Unit also executes high-risk search warrants, provides dignitary protection, and provides security and protection at O'Hare Airport and at large public events, including games at the City's professional sports stadiums and arenas.

The SWAT Unit is based out of Homan Square, which is located at 3340 West Fillmore, Chicago, Illinois 60624. The SWAT Unit is a volunteer unit, meaning that CPD officers voluntarily apply for entry into the unit and are eligible to be considered for admission only if they meet certain qualifications and pass a detailed selection process.

The SWAT Unit has a Commanding Officer, an Assistant Commanding Officer, supervisors (primarily sergeants), operators (who hold the rank of police officer), and other support personnel. The SWAT Unit is comprised of four squads, and each squad is supervised by at least one sergeant. The Commanding Officer, who has overall command of the SWAT Unit, reports directly to the CPD's Deputy Chief of Special Functions.

The CPD issues each SWAT operator weapons and equipment pursuant to SWAT Standard Operating Procedures ("SOP"). Among the issued gear are ballistic entry vests, a radio, headset, gas mask, night vision goggles, helmet, a Glock 9mm gun, and an M-4 carbine rifle. However, many SWAT operators have specialized roles in addition to their basic SWAT duties, including snipers, breachers, and medics. Snipers are strategically positioned in the field to gather intelligence and may be required to use sharpshooting skills for a resolution. Breachers are skilled at breaching doors, windows, walls, and other obstructions that may be faced during a SWAT incident. Medics provide required medical services on the scene. Given these additional roles, specialists are required to have additional gear to perform their duties.

The work schedule utilized by SWAT has been modified over the last several years. For the most part, however, SWAT has maintained a schedule in which, for a two-week period, two squads are assigned to work in "SORT cars" (Special Operations Response Time) and the other two squads are on a training cycle.[1] In the following two-week period, the two squads switch places. If a squad is on a two-week training cycle, it will typically train on six days and work in a SORT car on the other four work days in that cycle.

When a squad is on its two-week SORT car cycle, the operators on that squad report for duty at Homan Square at the beginning of each of their shift. The two SWAT squads working SORT car shifts are broken down into different watches and shifts. SWAT operators are provided with 15 minutes at the beginning of their shift, on the clock, to transfer their weapons and gear into the SORT car. They then report to roll call inside Homan Square. About 30 to 45 minutes before the end of their shift, operators return to Homan Square and are provided with at least 15 minutes prior to the end of their shift, on the clock, to transfer and secure their weapons and gear out of SORT cars so that the SORT cars are available for the next shift.

*Critical Incident Response and Compensation*

In the event of a critical incident, on-duty SWAT operators are the first called to respond. However, if the number of on-duty SWAT operators is insufficient, then there

---

[1] Plaintiffs add that SWAT operators are also assigned to work at Chicago O'Hare International Airport ("O'Hare"), where they report directly to the airport for duty. They also note that SWAT training has been cancelled on occasion due to understaffing in the SWAT Unit.

will be an off-duty call-out. When off-duty call-outs arise, operators are contacted via their CPD-issued e-mail and telephone to be notified of the incident and to determine if they are able to respond. When an operator responds to an off-duty call-out, the operator is considered on duty and compensated beginning from the time he/she responds to the e-mail or call, for driving to the scene and working at the scene, for driving back to Homan Square afterwards, and for attending a debrief at Homan Square. Operators are also provided with an additional 90 minutes to two hours of overtime compensation (depending on the situation) after the debrief at Homan Square to organize and clean their gear and weapons and to return home.

*Changing Policies Regarding Gear Storage*

From 2005 until March 2009, SWAT operators were not authorized to take their rifles home while off duty. During this time period, rifles were stored on a SWAT equipment truck that was kept at Homan Square when it was not in the field. In the event of a critical incident, members of the SWAT support staff drove the SWAT equipment truck to the scene of incident, and off-duty operators who responded to the incident picked up a rifle from the SWAT equipment truck on scene.

Beginning in March 2009, this practice shifted to eliminate the reliance on the arrival of the SWAT equipment truck. As a result, the CPD issued Special Functions Group Unit Special Order 09-01 ("SO 09-01"), which authorized and directed operators to bring their rifles home while off duty. SO 09-01 further dictated how the rifles must be transported and secured. The parties dispute whether SO 09-01 required SWAT

operators to take their rifles home or simply allowed them to do so at their choosing. The Plaintiffs note that the process of loading/unloading and storing their gear between their vehicle and their residence takes approximately 15 minutes.

After SO 09-01 was issued, if a SWAT operator did not feel comfortable storing his or her rifle at home, the SWAT command staff would assist the operator in arranging alternative storing while off duty, including at Homan Square. High-ranking officials as well as SWAT operators were well aware of this practice to accommodate operators who did not feel comfortable bringing their rifles home while off duty.

For example, Plaintiff Jesus Cano ("Cano") asked Captain Mark Marianovich ("Captain Marianovich") if he could store his SWAT rifle at Homan Square while off duty. Cano had young children at home and did not have a safe to properly secure his rifle. Captain Marianovich approved the request and allowed Cano to store his rifle on the equipment truck at Homan Square while off duty for a period of time. Cano was still required to transport and store the remainder of his SWAT gear in his residence while off duty so that he could respond directly to a critical incident where he would meet up with and retrieve his M-4 from the SWAT truck. Cano testified that if he left his rifle at Homan Square and the rifle was not yet at the scene of the incident when he arrived, he could still participate in the mission as an operator.

Lieutenant Thomas Lamb ("Lt. Lamb") testified that operators are authorized to leave rifles on the SWAT equipment trucks while off duty. He estimated that, as of May 2015, approximately five SWAT operators were storing their rifles on the SWAT

6

equipment truck at Homan Square while they were off duty. If these operators responded to an off-duty call-out, they picked up their rifles from the SWAT equipment truck at the scene of the incident.

On May 2, 2016, Steve Georgas, the then-Deputy Chief of Special Functions ("Georgas") issued a memorandum to Lt. Lamb reiterating the policies regarding the storage of SWAT weapons and gear while off duty ("Georgas Memorandum"). The Georgas Memorandum states that SWAT operators are not required to take their weapons and gear while commuting to and from home and work, and they are authorized to store their weapons and gear at Homan Square while off duty. The memorandum was e-mailed to the entire SWAT Unit and was posted in the SWAT "CO Book," which is accessible to operators and contains various SWAT policies, procedures, and notifications.

In May 2017, each SWAT operator was issued a CPD "extended hours use" vehicle ("take-home vehicle"). On September 22, 2017, Lt. Lamb issued a memorandum to all SWAT operators to reiterate SWAT's policies and practices relating to, among other issues, what operators were allowed to do with their weapons and gear while off duty ("Lamb Memorandum"). In the Lamb Memorandum, Lt. Lamb referred to the Georgas Memorandum and repeated that SWAT operators were allowed to store their weapons and gear at Homan Square while off duty. However, he wrote that if operators accepted a take-home vehicle, they were required to have their SWAT

7

weapons and gear in their take-home vehicle while commuting to and from home and work off duty.

Based on these events, the Plaintiffs filed their third amended class action complaint on November 3, 2017, claiming that they should be compensated for the time required to transport, load/unload, and store their gear between their vehicles and their residences. The Plaintiffs seek relief under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 216(b) (Count I), the Illinois Wage Payment Collection Act (the "IWPCA"), as amended, § 820 ILCS 115/1, *et seq.* (Count II), and the Illinois Minimum Wage Law (the "IMWL"), 820 ILCS 105/4(a) (Count III) for unpaid compensation, unpaid overtime compensation, liquidated damages, costs, attorneys' fees, declaratory and injunctive relief, and any such other relief the Court may deem appropriate. On January 22, 2018, the parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## **LEGAL STANDARD**

For cross-motions for summary judgment, the Court must "look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact." *Santanella v. Metro Life Ins. Co.,* 123 F.3d 456, 461 (7th Cir. 1997). Our factual and inferential construction is unaltered by the procedural nuance of cross-filings, for each party retains their "respective burdens on cross-motions for summary judgment." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008).

8

"Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed. Appx. 92, 95 (7th Cir. 2012).

## **DISCUSSION**

The City moves for summary judgment on all counts with respect to liability, as the parties agreed to bifurcate the assessment of liability and damages in this case. The Plaintiffs only move for summary judgment on Counts I and III, the FLSA and IMWL claims, respectively. The Court addresses their positions collectively for each count below.

**I. FLSA and IMWL Claims**

"Courts have generally held that the IMWL parallels the FLSA, and the Illinois Administrative Code provides that FLSA regulations provide guidance in interpreting the IMWL. Thus, the same analysis generally applies to both the FLSA and IMWL." *Pizano v. Big Top & Party Rentals, LLC*, 2017 WL 1344526, at *1 n.1 (N.D. Ill. 2017) (quoting *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2004 WL 1882449, at *4 (N.D. Ill. Aug. 18, 2004)). Accordingly, the Court will analyze the FLSA and IMWL claims together.

"The FLSA requires employers to pay overtime to certain employees who work more than 40 hours in a work week." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173

(7th Cir. 2011); *See* 29 U.S.C. § 201 *et seq.*. However, Congress amended the FLSA in 1947 by passing the Portal-to-Portal Act. 29 U.S.C. § 254. This Act provides that:

> [N]o employer shall be subject to any liability or punishment under the [FLSA] on account of the failure of such employer…to pay an employee overtime compensation, for…(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities….

*Id.* at § 254(a). Department of Labor regulations further clarify that an employee's regular commute is not intended to be a compensable activity under the FLSA, stating:

> An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites. Normal travel from home to work is not worktime.

29 C.F.R. § 785.35.

Although the default rule is that ordinary commute time is not compensable under the FLSA, the Supreme Court has recognized an exception when the activity is "integral and indispensable to the principal activities that an employee is employed to perform…." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 135 S. Ct. 513, 517 (2014). "Integral" means "necessary to the completeness or integrity of the whole; forming an intrinsic portion or element." *Id.* "Indispensable" means "a duty that cannot be dispensed with, remitted, set aside, disregarded, or neglected." *Id.* (internal quotation marks omitted).

The parties agree that the Plaintiffs' principal activity is to provide a tactical response to high-risk critical incidents. However, the parties disagree as to whether the transportation, loading/unloading, and storage of gear between the Plaintiffs' vehicles and residences is integral and indispensable to that principal activity. The Plaintiffs maintain that this activity is integral and indispensable to their ability to maintain "mission readiness," meaning that they are equipped to respond to a critical incident at any time. They aver that storing their gear at home allows them to respond directly to the scene of an incident in the event that they are called when off-duty. The City counters by saying that SWAT operators can perform their principal activity without having to take their gear home when they are off-duty. The Court agrees with the City.

In the event of a critical incident, on-duty SWAT operators are tasked with responding. If they need additional manpower to address the situation, available off-duty SWAT operators are requested to respond to the scene. Under these circumstances, the Court appreciates that time is of the essence and efforts to accelerate the response time promote the overall success of a SWAT team response. However, the parties agree that off-duty SWAT operators are already compensated for this time. They are paid from the time they receive the off-duty phone call until they return home from the critical incident, including the time it takes to transport, load/unload, and store their gear.

The time at issue is the off-duty efforts taken by the Plaintiffs when they are not responding to a critical incident, but simply maintaining a state of readiness. This

11

situation is akin to the Ninth Circuit's decision in *Balestrieri v. Menlo Park Fire Protection Dist.* 800 F.3d 1094 (9th Cir. 2016). There, firefighters brought an FLSA claim seeking overtime compensation for the time spent loading and transporting their gear to temporary duty stations. *Id.* at 1096–97. Similar to the Plaintiffs here, the firefighters were paid upon receiving a phone-call to respond when they were off-duty, but they were paid upon arrival at work if they were on-duty. *Id.* at 1097. The Ninth Circuit held that the off-duty time spent loading and transporting gear to another station was not compensable under the FLSA because it was "two steps removed" from the firefighters' principal activity of fire suppression. *Id.* at 1101. Essentially, the Court determined that the loading and transporting of gear was "preliminary" and "not intrinsic to" fire suppression. *Id.* Therefore, it was not integral and indispensable. *Id.*

The same rationale applies to the instant case. The Plaintiffs' principal activity is responding to critical incidents. However, the off-duty loading and transportation of SWAT gear is "two steps removed" from that principal activity. *Id.* While keeping SWAT gear at home may promote the overall goal of critical incident response, it is not integral and indispensable in much the same way that a firefighter's loading and transporting of gear is not integral and indispensable to fire suppression. Although these undertakings support the Plaintiffs' ability to respond to critical incidents, that does not mean that they are integral and indispensable. *Brand v. Comcast Corp.*, 135 F. Supp. 3d 713, 733 (N.D. Ill. 2015) ("The fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those

12

preshift activities are integral and indispensable to a principal activity. Nor does the fact that a given task increases the efficiency of a principal activity mean that it is integral and indispensable to that activity.").

Moreover, the record evidences that SWAT operators have been able to perform off-duty critical response efforts without having their gear at home, meaning that such a practice is not indispensable. For example, Cano stored his SWAT rifle at Homan Square while off duty and retrieved it from the SWAT truck upon arriving to the scene of the critical incident. As Cano was able to fulfill his principal activity despite not having his SWAT rifle at home, this activity is not integral and indispensable.

Having found that the transportation, loading/unloading, and storage of gear is not integral and indispensable to a SWAT operator's principal activity, the Court must return to the defaults laid out in the Portal-to-Portal Act. The practical effect of granting the Plaintiffs' requested relief would be to compensate them for the time spent commuting to and from work. Although the Court recognizes and applauds the Plaintiffs' efforts to hasten their response to critical incidents, the law prohibits a finding that such efforts are compensable when they primarily consist of commute time. As the Supreme Court stated, "[t]hese arguments are properly presented to the employer at the bargaining table, not to a court in an FLSA claim." *Busk*, 135 S. Ct. at 519. Accordingly, the Court grants summary judgment in the City's favor as to Counts I and III.

**II. IWPCA Claim**

The City next moves for summary judgment as to the Plaintiffs' IWPCA claim because there was no agreement between the parties that the Plaintiffs would be compensated for the time it takes to transport their gear between their vehicles and their residences and subsequently store it. The IWPCA gives employees "a cause of action against employers for the timely and complete payment of earned wages." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016). However, the IWPCA narrowly defines wages as "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties…." 820 ILCS 115/2. "As such, to state a claim under the IWPCA, the [plaintiffs] are required to demonstrate that they are owed compensation from defendants pursuant to an employment agreement." *Enger*, 812 F.3d at 568 (citing *Dominguez v. Micro Ctr. Sales Corp.*, 2012 WL 1719793 (N.D. Ill. 2012) ("[T]he IWPCA mandates overtime pay or any other specific kind of wage only to the extent the parties' contract or agreement requires such pay.")). As the Seventh Circuit has held, "the IWPCA provides no substantive relief beyond what the underlying employment contract requires." *Enger*, 812 F.3d at 570.

The Plaintiffs maintain that their IWPCA claim is based on the parties' employment agreement, which provides for overtime compensation. They state that the City's approval of the Plaintiffs' transportation and storage of their gear at home is in essence an agreement to make this undertaking compensable. While the City

acknowledges that the parties have an employment agreement that provides the Plaintiffs with a basis for overtime pay, it maintains that there was no agreement to compensate the Plaintiffs for the disputed overtime related to the transportation and storage of their gear. *See Brown v. Lululemon Athletica, Inc.*, 2011 WL 741254, at *3 (N.D. Ill. 2011) ("The inference of an employment agreement between the parties is distinct, however, from an inference that Lululemon agreed to compensate Brown for the time she spent attending a staff meeting, taking one exercise class per week, and listening to a motivational CD."). Indeed, the parties' agreement affords compensation only for "approved overtime." As the record and the existence of this lawsuit clearly indicate, the City did not agree to pay the Plaintiffs overtime for the transportation and storage of their gear. The City consistently denied the Plaintiffs' requests for such overtime pay, and there is no provision in the Plaintiffs' collective bargaining agreement that entitles them to compensation for this undertaking. Accordingly, the IWPCA claim cannot stand, and the Court grants summary judgment in favor of the City on Count II.

## CONCLUSION

For the aforementioned reasons, the Court grants the City's motion and denies the Plaintiffs' motion. It is so ordered.

Dated: 10/1/2019

_____

Charles P. Kocoras
United States District Judge